**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ANNE M. LINDBERG,           )
                      )
         Plaintiff,    )
                      )
      v.               )     Case No. 1:07-cv-122-SJM
                      )
CLARION SINTERED METALS,   )
INC., *et al.*,              )

### MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.,

This federal securities fraud action arises from a transaction occurring in 2006 whereby the Plaintiff Anne M. Lindberg, a former employee and minority shareholder of Defendant Clarion Sintered Metals, Inc. ("CSM"), sold her shares of CSM stock back to the company. Named as Defendants are CSM and two of its controlling shareholders, Howard H. Peterson and Benjamin F. Marzella. In addition to seeking relief under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10(b)-5, 17 C.F.R. § 240.10b-5, Lindberg has asserted state law claims of breach of fiduciary duty against the Defendants, based on acts of alleged oppression, misrepresentation and self-dealing. This Court's jurisdiction is premised upon 28 U.S.C. §§ 1331 and 1367.

Presently pending before the Court is the Defendants' Renewed Motion for Summary Judgment [39] on all claims. For the reasons set forth below, this motion will be granted as to the federal securities fraud claim. The remaining state law claims will be dismissed without prejudice to Plaintiff's right to pursue them in state court.

## I.  STANDARD OF REVIEW

Summary judgment is proper only where the moving party has established "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "To demonstrate that no issue is in dispute as to any material fact, the moving party must show that the non-moving party has failed to establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial."  *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).  To survive the motion, the non-moving party must show specific facts such that a reasonable jury could find in its favor.  *Id*. (*citing* Fed.R.Civ.P. 56(e)).  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla."  *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir.2005)) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).  In adjudicating a Rule 56 motion, we view the underlying facts and all reasonable inferences arising therefrom in the light most favorable to the party opposing the motion – here, the Plaintiff.  *McCabe*, 494 F.3d at 424; *Fasold v. Justice*, 409 F.3d 178, 180 (3d Cir.2005).  With that standard in mind, we set forth the relevant facts of record.

## II.  BACKGROUND

Plaintiff Anne M. Lindberg is a resident of Ridgway, Pennsylvania and a former employee and minority shareholder of CSM.  Defendants Peterson and Marzella are founders (along with three other individuals) of CSM and also serve as officers and directors of the corporation.  Collectively, they hold and control 82.1% of the company's stock.  They are also officers, directors, and controlling shareholders of a related company known as CSM Sales, Inc.

CSM is a Pennsylvania corporation engaged in the business of producing structural powered metal components for the automotive, lawn and garden, appliance and industrial markets.  The company was formed in 1984 through the purchase of assets formerly owned by International Powdered Metallurgy Company ("IPM"), a division of Thermco Systems, Inc.

Lindberg was a longtime employee of IPM, where she had worked as a machine operator since 1955.  Following the formation of CSM, she accepted employment there and remained with CSM until approximately 1988 when, at age 65, she retired.

Since its incorporation in 1984, CSM has maintained two classes of stock.  "Class A" shares were sold to members of the public, including Lindberg, at a price of $10.00 per share.  "Class B" shares were sold to the five founding members of CSM, including Peterson and Marzella, at a price of $1.00 per share.  A total of 42,035 shares of Class A stock were sold to various individuals, while 130,000 shares of Class B stock were sold to the company's founding members.  Lindberg purchased 1,000 shares of Class A stock for the sum of $10,000 on December 13, 1984.

By early 1997, Peterson and Marzella had become the controlling shareholders of CSM.  At some point that year, they incorporated an entity known as CSM Sales, Inc. (hereinafter, "CSM Sales"), a manufacturing representative firm which had ostensibly been organized for the purpose of promoting the sales of CSM in return for a commission.  As controlling shareholders of both companies, Peterson and Marzella

3

caused CSM to enter into a contract with CSM Sales, Inc., pursuant to which CSM would pay as much as 7% of its total annual revenues to CSM Sales. Most of the money received by CSM Sales was distributed directly to Peterson and Marzella.

Although this contractual arrangement was supposedly intended to enhance CSM's sales and control its costs, in reality, Lindberg claims, CSM Sales operated as a sham corporation with no business purpose in the sense that its transactions with CSM did not benefit CSM or its Class A shareholders. In this manner, Lindberg claims, Peterson and Marzella were able to skim revenues from CSM, thereby diminishing the company's profitability and avoiding the necessity of distributing such profits to minority shareholders. By Lindberg's estimates, since 1997 Peterson and Marzella have diverted to themselves more than $9 million of CSM's earnings.

Lindberg claims that the Defendants perpetrated the foregoing scheme through surreptitious means. In 1997 the company began to hold its annual shareholders' meeting at a more remote location in Erie, Pennsylvania rather than in Ridgway, where the company is located. This move, Lindberg posits, was intended to discourage the participation of minority shareholders like herself.

That same year, Peterson and Marzella undertook the practice of withholding the annual audited financial statements of CSM from its shareholders. According to Lindberg, this was significant because the audited financial statements contained information, under the topic "Related Party Transactions," which would have revealed "the extraordinary amount of money that Peterson and Marzella were transferring from the Company to CSM Sales, Inc. each year." (Pl.'s Br. in Opp. to Def.s' Mot. for Summ Judg. [29] at p. 6 n. 6.)

In lieu of the audited financial statements, CSM in 1997 began to issue "Condensed Financial Statements" to all Class A shareholders at the end of each fiscal year. These Condensed Financial Statements contained a basic balance sheet and income statement, but did not contain any explanation or text from the auditing accountant, and they revealed nothing about the existence of CSM Sales, Inc., or its

4

relationship with CSM.  Moreover, these Condensed Financial Statements were represented as having been prepared in accordance with Generally Accepted Accounting Principles ("GAAP").  According to Lindberg, that representation was false because GAAP requires financial notes, such as those that identify "Related Party Transactions," to accompany any representation of the financial performance of the company.  In other words, Lindberg claims, GAAP required the disclosure on the Condensed Financial Statements of the relationship between CSM and CSM Sales, Inc., which did not occur.

Lindberg has presented additional evidence suggesting that the Defendants sought to keep information concerning the relationship between CSM and CSM Sales hidden from its minority shareholders.  Both Robert V. Howard, a former General Manager and Director of CSM, and Scott Gibson, a former Controller and chief inside accountant for CSM, stated at depositions that it was their understanding that the existence and workings of CSM Sales were confidential matters not to be discussed.

As a minority shareholder, Lindberg received the Condensed Financial Statements distributed annually by CSM.  Although she would read these statements, she did not understand them and they meant nothing to her.  She admittedly lacked the education or experience to interpret these financial statements and she never requested assistance from anyone in order to better understand the documents. Accordingly, upon receiving the Condensed Financial Statements, she would disregard them and dispose of them.

In 2006 Lindberg, contemplating that she might soon have to move into a nursing home, decided "the time was right" to sell her Class A shares of stock.  (Lindberg Depo. at 29-31.)   Accordingly, in October of that year, Lindberg contacted Defendant Peterson and inquired whether CSM would repurchase her stock and, if so, what price the company would be willing to pay.  Peterson advised Lindberg that CSM would be willing to repurchase her shares at a price of $61.22 per share.  Lindberg agreed that this price was acceptable and sold her 1000 shares to CSM on or about December 2,

2006 for a total sum of $61,220.00.  At the time of this sale, Peterson and Marzella collectively owned approximately 104,000 Class B shares of the company, while Class A shareholders, including Lindberg, held approximately 20,400 shares.

According to Lindberg, after contacting Peterson and telling him that she was considering selling her shares, Peterson "didn't say much" but "said to let him know" what she wanted to do.  (Lindberg Depo. at 44.)  No further conversations occurred concerning the possible sale of her shares prior to the time the sale was consummated. (*Id*. at 48.)   At no time did Lindberg have other conversations with Peterson or any other representative of CSM concerning the value of her stock.  Lindberg never inquired of other employees, officers, directors or shareholders about the finances of the company or the value of her stock.  (Lindberg Depo. at 52-53.)  She had no understanding as to how the purchase price was calculated and she never sought information in that regard, nor did she care.  (*Id*. at p. 56.)

Moreover, Lindberg acknowledges that the decision to sell her shares was hers alone; Defendants did not induce or encourage her to sell her shares.  Lindberg understood that she was under no obligation to sell her stock and she made the decision to sell on her own because, in her words, "I knew the timing was right." (Lindberg Depo. at 56-57.)  She never asked anyone for advice on how to handle her stock.  (*Id*. at 64-65.)

The stock certificates which were issued to Lindberg in 1984 contained a provision granting the company the right of first refusal in the event the shareholder sought to transfer her shares.  That provision read as follows:

> Before transferring these shares, the shareholder shall first offer these shares to the corporation, Clarion Sintered Metals, Incorporated, at the then fair market value and if said corporation shall refuse to purchase them within 60 days of notification, the shareholder shall offer them to all remaining individual shareholders of this class in the order of the selling shareholder's choice at the then fair market value.  Any shareholder accepting the offer shall have 30 days to pay the selling shareholder.

(Lindberg Depo. at 59.)  Lindberg was completely unaware of this provision throughout

6

the time that she owned her shares, including at the time she agreed to sell her shares back to the company.  Prior to the commencement of this litigation, she had never seen or heard of the above-quoted language; as far as she was concerned, the language "didn't exist." (*Id*. at pp. 59-60.)  Accordingly, Lindberg acknowledges that the transfer restriction had "no effect" whatsoever on her decision to sell her shares in 2006. (*Id*. at 65.)  Moreover, while the language gave CSM the right of first refusal, Lindberg had no desire or intention of ever selling or transferring her shares to any third party, nor had she received any offers from third parties interested in purchasing her stock. (*Id*. at 48, 50-51, 54-55.)  In fact, Lindberg has stated that she would not have sold her stock to anyone other than CSM, even if a third party had made an offer which was better than the company's. (*Id*. at 54-56.)

The price which Lindberg ultimately received for her stock – $61.22 per share – represented book value based upon the figures contained in the Condensed Financial Statements circulated to Class A shareholders.  Plaintiff contends, however, that this "book value" had been improperly manipulated by Peterson and Marzella as a result of their scheme to funnel millions of dollars of CSM revenues to themselves and thereby artificially suppress the value of the company's stock.  At the time she sold her company stock, Lindberg knew nothing of CSM Sales or its relationship with CSM.  She had no idea, in particular, that CSM had paid approximately $9.5 million to CSM Sales during the years 1997 to 2007.

Lindberg admits that, at the time Peterson offered to buy her stock at $61.22 per share, she had no understanding as to how that price was determined, did not inquire, and did not care. (Lindberg Depo. at p. 56, 67, 70.)  Instead, she relied upon CSM management to inform her as to the value of her shares and she apparently assumed this price to be fair.  In her affidavit, however, Lindberg states, "Had I been told that Mr. Peterson and Mr. Marzella had taken millions of dollars from Clarion Sintered Metals, Inc. by funneling that money through CSM Sales, Inc., I believe that I would have asked others to help me understand how that impacted the value of my shares in the

7

company." (Lindberg Affidavit [32-1] at ¶ 16.)  She further states that, "If, prior to the sale of my shares in Clarion Sintered Metals, inc., I had been informed that the value of my shares had been significantly reduced by the conduct of Mr. Peterson and Mr. Marzella in talking millions of dollars from the company through CSM Sales, Inc., I would have demanded a price greater than $61 per share for my holdings." (*Id*. at ¶ 17.)

Based on the foregoing facts, Defendants have moved for summary judgment on all of Lindberg's state and federal claims.  The issues have been briefed and argued and are now ripe for consideration.

## III.  DISCUSSION

A.     Plaintiff's Federal Securities Fraud Claim

The basic legal principles controlling Lindberg's federal securities law claim are not in dispute.  Private federal securities fraud actions like the case at bar are premised upon federal securities statutes and their implementing regulations.  "Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the 'use or employ[ment] ... of any ... deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.'" *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (*quoting* 15 U.S.C. § 78j(b)).  "Commission Rule 10b-5 forbids, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made ... not misleading.'"  *Id*. (*quoting* 17 CFR § 240.10b-5 (2004)).

Courts have interpreted these provisions as providing a private cause of action to aggrieved investors who are harmed by materially false or misleading statements, and Congress has imposed statutory requirements on that private action.  *Dura Pharmaceuticals, Inc.*, 544 U.S. at 341 (*citing by way of example* 15 U.S.C.

§ 78u-4(b)(4)).  The Supreme Court has stated that, in cases involving publicly traded securities, the private right of action includes six "basic elements," *to wit*:

(1)    a material misrepresentation (or omission);

(2)    scienter, *i.e.*, a wrongful state of mind;

(3)    a connection with the purchase or sale of a security;

(4)    reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation";

(5)    economic loss; and

(6)    "loss causation," *i.e.*, a causal connection between the material misrepresentation and the loss.

*Dura Pharmaceuticals, Inc.*, *supra*, at 341.  *See also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006).

As is commonly the case in any civil action, the nature of the Plaintiff's claims have evolved in conformity with the facts revealed through discovery.  In her complaint, Lindberg initially alleged that the Defendants had violated the federal securities laws by withholding from her, in connection with the sale of her stock, material information consisting of at least twelve separate pieces of information.  As the case presently stands, however, Lindberg has pared her § 10b-5 claim down to the following allegations of fraud.  First, she contends that the Defendants falsely represented on their Condensed Financial Statements that the statements were compiled in accordance with Generally Accepted Accounting Principles.  Second – and relatedly, Lindberg contends that the Defendants, in contravention of GAAP and Pennsylvania law,[1] intentionally failed to disclose information concerning the company's "Related

---

[1] According to Lindberg, the Defendants were statutorily required under § 1554(a) of the Pennsylvania Business Corporation Law, 15 Pa. C.S.A. § 1554(a), to provide this information.  She maintains that, because Defendants prepared GAAP-compliant financial statements for the company's own internal use, § 1554(a) required

Party Transactions." More precisely, Lindberg objects to the fact that the Defendants circulated Condensed Financial Statements which omitted any reference to the company's "Related Party Transactions" with CSM Sales, Inc. or the audited financial statements from which such information was derived. By failing to disclose such information, Lindberg claims, Defendants "methodically and consistently concealed the fact that the controlling shareholders of the Company (Peterson and Marzella), using CSM Sales, Inc. as a conduit, were diverting substantial sums of money from the Company to themselves, all at the cost of the Class A minority shareholders..." (Pl.'s Br. in Opp. to Defs.' Mot. for Summ. Judg. [29] at p. 13.) In her sur-reply brief in opposition to the pending motion, Lindberg provides an example of the type of information which was improperly omitted from the condensed financials: *to wit*, information disclosing –

* the existence of CSM Sales,

* the fact that CSM's majority stock owners also held a majority ownership interest in CSM Sales,

* the fact that CSM had entered into a contract (during a given year) with CSM Sales for the purpose of enhancing CSM's sales, marketing its products, and controlling corporate costs, and

* the amount of monies CSM paid to CSM Sales pursuant to the contract (e.g., over $1,000,000 in a given fiscal year).

Defendants contend that Lindberg's § 10b-5 claim fails as a matter of law because she cannot make the requisite showing of (a) fraudulent misrepresentation or omission, (b) scienter, (c) reliance/ transaction causation, and (d) loss causation. Because the Defendants' challenges as to transaction causation and loss causation are dispositive, however, I need not reach the other aspects of Defendant's motion insofar

---

them to provide this same GAAP-compliant information to their shareholders. Defendants dispute the Plaintiff's assertion that they were statutorily required to provide their shareholders with GAAP-compliant financial statements. For purposes of this Memorandum Opinion, we will assume only for the sake of discussion, without deciding, that such a statutory duty exists.

as it relates to the § 10b-5 claim.

(i) <u>Transaction Causation/ Reliance</u>

In the securities context, the concept of causation is "strikingly similar to the familiar standard in the torts context, but with different labels." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006). "In the securities realm, 'but for' causation is referred to as 'reliance, or transaction causation,' and 'proximate cause' is known as 'loss causation.'" *Id*. Our Circuit Court of Appeals has stated that a plaintiff pursuing a 10b-5 claim must show both forms of causation. *McCabe*, 494 F.3d at 425 ("[W]e have consistently required that both transaction causation and loss causation must be established in § 10(b) cases, and have never allowed the elements to merge.").

To show reliance, or transaction causation, a § 10(b) plaintiff must prove that "but for the fraudulent misrepresentation, the investor would not have purchased or sold the security." *Berckeley Inv. Group*, 455 F.3d at 222 (*quoting Newton II*, 259 F.3d at 172). "Stated differently, the plaintiff must prove that 'but for the wrongful conduct, the transaction would not have gone through, at least in the form that it eventually took.'" *Id*. (*quoting* 3 Thomas Lee Hazen, The Law of Securities Regulation, § 12.11[2] (5th ed. 2005) and citing *Suez Equity Investors, L.P., Sei Assocs. v. Toronto-Dominion Bank*, 250 F.3d 87, 95-96 (2d Cir.2001) ("Transaction causation is based upon the plaintiff's reliance upon the defendant's deceptive statements or omissions; that is, but for such conduct by the defendant, the plaintiff would not have acted to his detriment.")).

The Supreme Court has recognized a rebuttable presumption of reliance in two situations:

> First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. .... Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

*Stoneridge Inv. Partners,* 552 U.S. at 159 (internal and concluding citations omitted). Because Lindberg's claim is based primarily upon the alleged fraudulent omission of material information,[2] she claims that she is entitled to a presumption of reliance.

I find, however, that any presumption of reliance to which Lindberg is entitled has been rebutted by the facts of record such that no genuine issue of fact exists as to that element of her claim. More specifically, the record here does not permit a reasonable inference that, but for the Defendants' allegedly fraudulent omissions, Lindberg would not have decided to sell her shares. On the contrary, the record here is clear that Lindberg made a decision in October of 2006 to sell her CSM stock back to the company because "the timing was right" for her to get her financial affairs in order and, for health-related reasons, she created a self-imposed deadline of January 2007 to settle the matter. (*See* Lindberg Depo. at 29-31, 44, 56-57, 75.) It is equally clear that Lindberg was determined to sell her stock only to the company rather than see it transferred to her estate or sold to a third party. (*Id*. at 50-51, 54-56, 74-75.)

Lindberg claims that this type of argument "misses the point" because "[t]he absence of information about the relationship between the defendants and CSM Sales, Inc. is causally connected to the decision of Mrs. Lindberg to sell *at a price of $61 per*

---

[2] To the extent Lindberg's claim is premised upon an affirmative misrepresentation, *i.e.*, the Defendants' allegedly false statement that the Condensed Financial Statements distributed annually to Class A shareholders had been prepared in compliance with Generally Accepted Accounting Principles, Lindberg is not entitled to any presumption of reliance, nor has she produced any affirmative evidence of reliance – or, for that matter, loss causation – as to this aspect of her claim. In addition, the Court notes that the Defendants' allegedly fraudulent statement about GAAP compliance was not made "in connection with the sale or purchase of a security" and is therefore not actionable under § 10(b) of the Securities Exchange Act of 1934 for that reason as well. *See* 15 U.S.C. § 78j(b) (making it illegal for any person "[t]o use or employ, **in connection with the purchase or sale of any security**.... any manipulative or deceptive device...") (emphasis added); *Dura Pharmaceuticals, Inc.*, 544 U.S. at 341 (basic elements of a § 10(b) claim include "a connection with the purchase or sale of a security")(citation omitted). My analysis will therefore focus on that aspect of Lindberg's § 10(b) claim which concerns allegedly fraudulent omissions.

*share."* (Pl.'s Br. in Opp. to Defs.' Mot. for Summ. Judg. [29] at p. 17 (emphasis in the original).)  In other words, Lindberg claims entitlement to a presumption that, if full disclosure had occurred, the transaction would not have gone through in the form it took.  Indeed, in her affidavit, Lindberg asserts that, had she known the truth about CSM's relationship with CSM sales, she would have demanded a price greater than $61 per share for her holdings.  (Lindberg Aff. at ¶ 17.)

Such a presumption, however, is belied by the evidence here.  Lindberg's deposition establishes that, at the time she inquired about selling her stock back to CSM, no representations were made to her other than the price at which Defendants would be willing to repurchase her shares.  (Lindberg Depo. at 44-45, 52.)  Although Lindberg had no understanding as to how the purchase price had been calculated, she did not ask for any information along those lines and did not even care.  (*Id*. at 56.)  Her testimony was clear that, at no time, either in connection with the sale of her securities or otherwise, did she seek additional information from the Defendants or anyone else at CSM concerning the company's finances, the value of her shares, or the manner in which the price per share was determined.  (*Id*. at 32, 52, 53, 67.)  When it came to handling her stock, she never sought any advice from anyone else, including professionals such as bankers or attorneys, just (as she put it) "myself."  (*Id*. at 64; *see also id*. at 64-65, 76.)  As far as Lindberg was aware, the company was willing to pay $61.22 per share and she considered that price acceptable.  (*Id*.)  In fact, Lindberg admitted, "I wouldn't have cared if I had only sold it for $10 each.  It made nothing to me [sic].  It wasn't making money and I figured well, let's get rid of it."  (*Id*. at 75.)

The record also shows that Lindberg had no potential offers from other parties to purchase her shares as of December 2006, nor was she interested in selling her stock to any third party.  (Lindberg Depo. at 48, 50-51.)  Indeed, Lindberg was clear in her testimony that she would not have considered selling her shares to anyone other than CSM, even if a third party had offered her more than the company was willing to pay for her holdings:

Q.    If someone wanted to buy your shares for $75, did you understand that you could sell those shares to that person if you first gave the company and any other Class A shareholders the opportunity to buy those shares?

A.    I would not sell it.

Q.    Okay.  Is it you didn't want to sell to anyone other than the company?

A.    The company

Q.    Okay.

A.    Just the company.

Q.    Okay.  And why was that?

A.    Because we had a good company and a nice growing company and raising three sons you always think down the road maybe they'll need a job some day and maybe other people community wise will need an opportunity and which was my whole stake in signing my shares – for my shares to help, and which we did.

Q.    Uh-huh.  So if I understand you correctly, and correct me if I'm wrong, you had no interest in selling your shares to anyone other than the company even if they offered you more money for them?

A.    I had no interest.

                                    ***

Q.    My statement is correct you had no interest in selling them even if they offered you more money?

A.    Never any interest in selling.

Q.    Okay.  And when you say never any interest in selling, meaning except to the company; is that right?

A.    Except for my company.

(Lindberg Depo. at 54-56.)

Lindberg acknowledges that she took the initiative on her own to sell her stock because she wanted to put her financial affairs in order "while [she] still could manage that part of [her] life."  (Lindberg Depo. at 30.)  Noone ever encouraged her to sell her stock and the decision to sell was hers alone.  (*Id*. at 51.)  She understood she was under no obligation to sell her shares if she did not like the price offered.  (*Id*. at 51, 56-57.)  She was admittedly interested in making her own decisions; as she frankly stated, "I wanted to make my own plans, use my own head, nobody else's and figure things out what's best for the children..."  (*Id*. at 30.)  After talking to Peterson about the possible

sale of her shares, she discussed the matter with her family; as she described it, "... we all sat down and talked, it was my opinion and my word what had to be done." (*Id*. at 46.)

Lindberg was also frank in acknowledging that the prior Condensed Financial Statements that had been issued by the company meant nothing to her, as she lacked the education or experience necessary to understand them. (Lindberg Depo. at 27-28.) Although she would look them over, she never took them to anyone else, such as an accountant or a friend, in order to better understand the information contained in the statements. (*Id*. at 28)   Accordingly, she would basically disregard the statements and dispose of them. (*Id*. at 27, 67-68.)

Despite all this, Lindberg maintains that the record could support an inference of reliance – *to wit*, that, with full disclosure on the part of the Defendants, she would not have agreed to the transaction such as it was.  Lindberg maintains that she was never specifically questioned during her deposition as to what she might have done if she had received full disclosure of the company's finances.  In point of fact, however, defense counsel attempted to question her on that point and her response was basically ambiguous:

> Q       .... Sitting here today, is there any information that you didn't receive from Clarion Sintered Metals or from Mr. Marzella or Mr. Peterson that you feel you should have received?
>
> A.      Yes.
>
> Q.      Okay.  Could you tell me what that is?
>
> A.      I don't know positively, but I just wanted information on you would call it rumors.
>
> Q.      What were the rumors?
>
> A.      I have no idea.
>
> Q.      Okay.
>
> A.      No, hearsay.
>
> Q.      Did you hear those rumors before you sold your stock?
>
> A.      No.

15

Q.     Okay.  If – if the company had sent you more elaborate, longer, more involved financial statements, would you have been able to understand them?

A.     If I didn't, I would have found out.

Q      Okay.  Did you ever show any of the financial statements that were sent to you to anyone?

A.     No.

Q.     Okay.  And you told me earlier that you didn't understand those financial statements?

A.     No.

Q      Okay.  If you had received more extensive financial statements, do you think you would have had any better luck in understanding them?

MR. DELANEY: Object to the form.  Go ahead and answer it if you can.

THE WITNESS: I think it's communication is what we lacked.

BY MR. LANZILLO:

Q.     Okay.  But if you had received more elaborate financial statements, do you think you would have had any better luck in understanding those?

A.     Yes.

Q.     Why is that?

A.     Well, because if we invest to begin with, I feel that we have the information as to if we want to pursue other investments and where that money is going in investing, which is the purpose of investing to begin with.

(Lindberg Depo. at 68-70.)  I find nothing in the foregoing testimony which rehabilitates the presently rebutted presumption that Lindberg would have engaged in a different transaction with the benefit of full disclosure.

Even Lindberg's affirmative statements in her affidavit do not provide a basis for establishing reliance.  In part, her affidavit states that, "Had I been told that Mr. Peterson and Mr. Marzella had taken millions of dollars from Clarion Sintered Metals, Inc. by funneling that money through CSM Sales, Inc., I believe that I would have asked others to help me understand how that impacted the value of her shares in the company."  (Lindberg Aff. at ¶ 16.)  However, this averment – that Lindberg thinks she might have sought assistance in trying to understand the financial repercussions of the Defendants' conduct – falls short of establishing that the transaction in question would

16

not have occurred.  Moreover, to the extent Lindberg's reliance depends on disclosure of an alleged breach of fiduciary duty, Lindberg's theory likely runs afoul of *Werner v. Werner*, 267 F.3d 288 (3d Cir. 2001), wherein the court admonished that "a plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose the breach of fiduciary duty."  *Id.* at 299 (citation omitted).

Lindberg also avers that, "If, prior to the sale of my shares in Clarion Sintered Metals, Inc., I had been informed that the value of my shares had been significantly reduced by the conduct of Mr. Peterson and Mr. Marzella in taking millions of dollars from the company through CSM Sales, Inc., I would have demanded a price greater than $61 per share for my holdings."  (Lindberg Aff. at ¶ 17.)  However, this theory requires a disclosure of more information than Defendants were legally obligated to provide.  As Plaintiff's counsel acknowledged during oral argument, full disclosure could have taken the form of simply providing Lindberg the accountant's note out of the company's audited, GAAP-compliant financial statements which described the company's Related Party Transactions with CSM Sales.  For the reasons discussed, the record here does not permit a reasonable inference that Lindberg's receipt of such materials would have resulted in a sale on different terms.

In sum, to the extent Lindberg is entitled to a presumption that fully GAAP-compliant financial statements and disclosure of CSM's Related Party Transactions would have resulted in a different stock transaction, that presumption has been amply rebutted by the evidence of record and no reasonable jury could find that transaction causation exists.  This reason independently compels the conclusion that Lindberg's § 10(b) claim cannot survive summary judgment.

(ii) <u>Loss Causation</u>

I also find that Plaintiff has failed to establish a genuine issue of fact as to loss

causation.  Unlike transaction causation, loss causation involves a more exacting

standard.  As our Circuit Court of Appeals has explained:

> [t]o prove loss causation, the plaintiff must demonstrate "that the
> fraudulent misrepresentation actually caused the loss suffered."  *Newton
> II*, 259 F.3d at 173.  Similar to the concept of proximate cause in the tort
> context, loss causation focuses on whether the defendant should be held
> responsible as a matter of public policy for the losses suffered by the
> plaintiff.  *Suez Equity Investors*, 250 F.3d at 96.  Thus, "[t]he loss
> causation inquiry typically examines how directly the subject of the
> fraudulent statement caused the loss, and whether the resulting loss was
> a foreseeable outcome of the fraudulent statement."  *Id*.  The United
> States Court of Appeals for the Seventh Circuit has succinctly explained
> that the loss causation element requires the plaintiff to prove "that it was
> the very facts about which the defendant lied which caused its injuries."
> *Caremark, Inc. v. Coram Healthcare Corp*., 113 F.3d 645, 648 (7th
> Cir.1997) (*citing LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931
> (7th Cir.1988)).

*Berckeley Inv. Group, supra*, at 222.

In the typical "fraud-on-the-market" §10(b) action, the plaintiff alleges that the

price of a publicly traded security was artificially inflated as the result of a fraudulent

misrepresentation or omission; in such cases, "to satisfy the loss causation

requirement, the plaintiff must show that the revelation of that misrepresentation or

omission was a substantial factor in causing a decline in the security's price, thus

creating an actual economic loss for the plaintiff."  *McCabe*, 494 F.3d at 425-26.  In the

"non-typical" case, where the plaintiff is not merely alleging that the price of a publicly

traded security has been affected, "the factual predicates of loss causation fall into less

of a rigid pattern."  *Id*. at 426.

In either a "typical" or "non-typical" case, however, a plaintiff seeking to satisfy

the loss causation requirement "must show that the defendant misrepresented or

omitted the very facts that were a substantial factor in causing the plaintiff's economic

loss."  *McCabe*, 494 F.3d at 426.  *See also Berckeley*, 455 F.3d at 223 ("[A] plaintiff

does not meet the loss causation element if he fails to prove that the drop in the value

18

of a security is related to the alleged misrepresentation. ... In that situation, it cannot be said 'that the alleged misrepresentation proximately caused the decline in the security's value to satisfy the element of loss causation.").

Here, it cannot be said that the allegedly fraudulent omission proximately caused the Plaintiff's economic loss.  Lindberg contends that, at the time she undertook to sell her shares, the Defendants owed her a duty of full disclosure concerning the company's Related Party Transactions with CSM Sales.  Yet the loss which Lindberg incurred – namely, the artificial suppression of the book value of her stock shares, was not the result of the Defendants' failure to inform her of these Related Party Transactions; rather, it was the result of recurrent acts of alleged corporate malfeasance on the part of CSM's principles over the course of many years.  Although disclosure of these transactions might have clued a minority shareholder like Lindberg in to the possible existence of corporate mismanagement, or even a potential breach of fiduciary duties, the failure to disclose did not itself account for the suppressed price of the company's Class A shares.  Accordingly, Lindberg cannot establish loss causation as a result of the Defendant's allegedly fraudulent omission.

Lindberg appears to take the position, though, that her loss should be measured as the difference between what she was paid ($61,220, based on the stated book value of her stock at $61.22 per share) and the amount that she theoretically *would have been paid* according to the true book value of the stock, once all of the earnings improperly diverted from CSM were credited back to the company.  She claims, in other words, that, because of the alleged fraudulent omission, she was induced to sell her stock at an artificially low price.  However, this measure of loss – *i.e.,* Lindberg's claim that the Defendants' omission prevented her from holding out for a higher share price – essentially conflates her stated theories of causation loss and transaction loss.  Our Circuit Court of Appeals has stressed the fact that both loss causation and transaction causation must be established for a § 10(b) claim and the two concepts cannot be conflated.  *See McCabe*, 494 F.3d at 429-30 (plaintiffs' attempt to demonstrate loss

19

causation by showing that they were induced into the subject transaction by the defendant's allegedly fraudulent omission "impermissibly conflate[d] loss causation with transaction causation, rendering the loss causation requirement meaningless").

For these reasons, I find that the record cannot support a finding of loss causation. This failure of proof constitutes a second reason why Plaintiff's § 10(b) claim cannot survive summary judgment. Accordingly, Defendants' motion for summary judgment will be granted insofar as it relates to Lindberg's federal securities claim.

B.   <u>Plaintiff's State Law Claims</u>

Lindberg has also asserted claims under Pennsylvania law for breach of fiduciary duty based on the Defendants' alleged acts of misrepresentation, oppression, and self-dealing. As the parties here are not diverse for purposes of 28 U.S.C. § 1332, the Court's sole basis of jurisdiction over these claim is 28 U.S.C. § 1367, which provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." *Id*. at § 1367(c)(3). *See Elkadrawy v. Vanguard Group, Inc.*, 584 F.3d 169, 174 (3d Cir. 2009) (once the District Court dismissed the plaintiff's federal claims, leaving only the state claim, the prerequisites for § 1367(c)(3) were met). Accordingly, this Court declines to exercise supplemental jurisdiction over the remaining breach of fiduciary duty claims and those causes of action will be dismissed without prejudice.

**IV.  CONCLUSION**

Based upon the foregoing reasons, the Defendants' renewed motion for summary judgment will be granted with respect to the Plaintiff's claim premised on alleged violations of the federal Securities Exchange Act of 1934 § 10(b) and SEC Rule 10(b)-5.  The motion will be denied with respect to Plaintiff's remaining state law claims premised on the Defendants' alleged breach of fiduciary duty, and those state law claims will be dismissed without prejudice.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ANNE M. LINDBERG,                          )
                                                                )
     Plaintiff,                  )
                                                                )  Case No. 1:07-cv-122-SJM
 v.                                                       )
                                                                )
CLARION SINTERED METALS,            )
INC., *et al.*,                                       )


**ORDER OF JUDGMENT**

  AND NOW, *to wit*, this 31st day of March, 2010, for the reasons set forth in the accompanying Memorandum Opinion,

  IT IS ORDERED that the Defendants' Renewed Motion for Summary Judgment [39] be, and hereby is, GRANTED in part and DENIED in part as follows:

  1. Said motion is GRANTED insofar as it relates to Plaintiff's federal claim premised upon alleged violations of the Securities Exchange Act of 1934 § 10(b) and SEC Rule 10(b)-5; and

  2. Said motion is DENIED insofar as it relates to Plaintiffs' state law claims for breach of fiduciary duty premised upon alleged acts of oppression, misrepresentation, and self-dealing.

  IT IS FURTHER ORDERED that, as to Plaintiff's federal claim premised upon alleged violations of the Securities Exchange Act of 1934 § 10(b) and SEC Rule 10(b)-5, JUDGMENT be, and hereby is, ENTERED in favor of Defendants Clarion Sintered Metals, Inc., Howard H. Peterson, and Benjamin F. Marzella and against Plaintiff Anne M. Lindberg.

IT IS FURTHER ORDERED that Plaintiffs' state law claims asserting breach of fiduciary duty be, and hereby are, DISMISSED WITHOUT PREJUDICE.

s/      Sean J. McLaughlin

SEAN J. McLAUGHLIN
United States District Judge

cc:    All counsel of record.